1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    JONATHAN R.DOOLITTLE (290638)
2   jonathan.doolittle@pillsburylaw.com
    Four Embarcadero Center, 22nd Floor
3   San Francisco, CA 94111-5998
    Telephone:    415.983.1000
4   Facsimile:    415.983.1200

5   Attorneys for Plaintiff Wells Fargo Bank, National Association

6

7

8                    IN THE UNITED STATES BANKRUPTCY COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                           OAKLAND DIVISION

11
                                              Case No. 20-40990-RLE
12  In re:
                                              Chapter 7
13  FAIRN & SWANSON, INC.,

14       Debtor.                              **DEFENDANT'S RESPONSE TO
                                              DIAGEO'S COMPLAINT FOR
15                                            DECLARATORY RELIEF TO
                                              DETERMINE (1) WHETHER
16  DIAGEO BRANDS BV, DIAGEO SCOTLAND         DIAGEO'S PRODUCTS ARE
    LIMITED, and DIAGEO NORTH AMERICA, INC.,  PROPERTY OF THE ESTATE; (2)
17                                            THE EXTENT OF WELLS FARGO'S
         Plaintiffs,                          SECURITY INTEREST IN THE
18                                            DIAGEO PRODUCTS; AND (3) IN THE
    v.                                        ALTERNATIVE, WHETHER THE
19                                            TRUSTEE IS PROHIBITED FROM
    LOIS I. BRADY, as Trustee for the Chapter 7  ASSUMING AND ASSIGNING THE
20  of FAIRN & SWANSON, INC., and WELLS       DISTRIBUTION AGREEMENTS
    FARGO BANK, NATIONAL ASSOCIATION          ABSENT DIAGEO'S CONSENT OR
21                                            WHETHER THEY MAY BE
         Defendants.                          TERMINATED PURSUANT TO 11
22                                            U.S.C. § 365(E)**

23

24

25                                            **Adv. Proc. No. 20-04034-RLE**

26

27

28

11990749v2 9/14/2020 8:00 PM 1989.692                                                    Case No. 20-04034-RLE
                                                                                         4827-5759-5083.v1

# NATURE OF THE CASE

1.     Diageo brings this adversary proceeding to obtain declaratory judgment determining the respective rights and interests between Diageo, Lois L. Brady, the Chapter 7 Trustee ("**Trustee**") in the above-captioned bankruptcy case, Wells Fargo Bank, N.A. ("**Wells Fargo**"), and any prospective buyers of Diageo's trademarked goods. At the time of the bankruptcy filing, Fairn & Swanson, Inc. (the "**Debtor**") had millions of dollars' worth of beer and spirits in its possession pursuant to a non-exclusive license to sell Diageo's goods at the U.S./Mexico border and on marine vessels such as cruise ships.

**ANSWER:**     Answering Paragraph 1, Wells Fargo admits that Diageo has brought a declaratory judgment action and that the Debtor has millions of dollars' worth of beer and spirits in its possession that it purchased from Diageo pursuant to a distribution agreement. Wells Fargo denies each and every remaining allegation contained in Paragraph 1.

2.     The distribution agreements between Diageo and Debtor govern the sale of these trademarked goods, and those contracts are governed by English law pursuant to the choice of law clauses agreed to by the parties. England bears a close connection to these international commercial contracts given Diageo's parent company is based in London, and many of Diageo's trademarked products are produced in and shipped from the United Kingdom ("**UK**").

**ANSWER:**     Answering Paragraph 2 of the Complaint, Wells Fargo states that the distribution agreements between Diageo and Debtor speak for themselves and that the allegations of Paragraph 2 are legal conclusions and not an entire statement of the choice of law analysis under California law or the Uniform Commercial Code ("UCC"); and on that basis Wells Fargo denies the allegations of Paragraph 2. Wells Fargo further denies that English law governs Diageo's interests in products that are in Debtor's possession and constitute Wells Fargo's collateral (the "Collateral") under that certain Credit Agreement dated as of November 10, 2017, by and between Debtor and Wells Fargo, as amended, modified and supplemented from time to time ("Prepetition Credit Agreement").

2

4827-5759-5083.v1

3.    The distribution agreements between Diageo and Debtor required the Debtor to pay the purchase price in full before legal and beneficial title of the goods would pass to Debtor, and until then absolute title was retained by Diageo. This condition existed notwithstanding delivery to and possession by Debtor and is recognized under English law as a valid condition precedent to the transfer of title such that the seller retains an unencumbered interest in the delivered goods that is superior to the interests of the buyer and its secured creditors. Diageo now seeks a declaration from this Court that upholds these legal principals. The law of England, and specifically the UK Sale of Goods Act 1979, recognizes the validity of retention of title clauses, unlike law in the United States that treats retention of title clauses as nothing more than just a security interest in favor of the seller.

**ANSWER:**    Answering Paragraph 3 of the Complaint, Wells Fargo states that the distribution agreements between Diageo and Debtor speak for themselves and that the allegations of Paragraph 3 are legal conclusions; and on that basis Wells Fargo denies the allegations of Paragraph 3, other than that Wells Fargo admits that the goods have been delivered to and are in the possession of the Debtor, and that United States law treats retention of title clauses as nothing more than just a security interest in favor of the seller.  Wells Fargo further answers that the Court should declare that the laws of the United States governs determination of title and priority and perfection of security interests in products that are in Debtor's possession and constitute Wells Fargo's Collateral, and that UCC § 2-401 governs the legal effect of the title retention clauses of sales contracts through which products that were sold to, delivered to and are in the possession of Debtor, and constitute the Collateral.

4.    In the alternative, even if title to the goods passed to the Debtor, the Debtor's use of the goods is based upon the license of the Diageo trademarks. Without the license provided under the distribution agreements, the Trustee may not use or sell the Diageo products without Diageo's consent, and Diageo has the right to terminate the distribution agreements.

**ANSWER:**    Answering Paragraph 4 of the Complaint,  Wells Fargo states that the allegations of Paragraph 4 are legal conclusions and not a complete statement of United States law on the subject,

3

4827-5759-5083.v1

and on that basis denies them. Wells Fargo affirmatively states that neither the Trustee nor any subsequent purchaser needs a license from Diageo to sell the Products because the Products are genuine goods in which Diageo's trademark rights have been exhausted by the sale to Debtor.

## NOTICE OF RELIANCE ON FOREIGN LAW

5. Diageo hereby provides notice of its intent to rely on a foreign country's law in accordance with Federal Rule of Civil Procedure 44.1 made applicable by Federal Rule of Bankruptcy Procedure 9017. More specifically, Diageo intends to rely on English law as to Counts 1 and 2 in accordance with the parties' choice of law provision in the contracts governing their transactions.

**ANSWER:** Wells Fargo admits that Diageo is relying on a foreign country's law, states that the Diageo distribution agreements speak for themselves, denies that English law governs the title and priority and perfection of security interests in the products that are in Debtor's possession and constitute Wells Fargo's Collateral, and affirmatively states that UCC § 2-401 governs the legal effect of the title retention clauses of sales contracts through which products that were sold to Debtor, delivered to and are in the possession of Debtor, and constitute the Collateral. Wells Fargo denies all other allegations in Paragraph 5.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157, 1334, and 2201. This matter is a core proceeding under 28 U.S.C. § 157(b).

**ANSWER:** Wells Fargo admits the allegations contained in Paragraph 6.

7. This adversary proceeding has been commenced in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure and is a core proceeding under 28 U.S.C. § 157(b).

**ANSWER:** Wells Fargo admits the allegations contained in Paragraph 7.

8. Venue is proper as provided in 28 U.S.C. § 1409 because this adversary proceeding is related to and arises in Debtor's bankruptcy case pending in this District (the "**Bankruptcy Case**").

4

4827-5759-5083.v1

**ANSWER:** Wells Fargo admits the allegations contained in Paragraph 8.

      9.      This Court has jurisdiction over the Trustee as the representative of the Debtor's bankruptcy estate (the "**Estate**"). This Court has jurisdiction over Wells Fargo because Wells Fargo has submitted to the Court's jurisdiction by appearing in the Bankruptcy Case and filing a proof of claim on July 8, 2020.

**ANSWER:** Wells Fargo admits the allegations contained in Paragraph 9.

## PARTIES

      10.    Plaintiffs Diageo Brands BV, Diageo Scotland Limited, and Diageo North America, Inc. are producer and/or supplier affiliates of Diageo plc, a London-based multinational beverage and alcohol company of some of the most well-known alcohol brands (the "**Diageo Products**") including Buchanan's, Johnnie Walker, Smirnoff, Guinness, Harp, Crown Royal, and Tanqueray gin just to name a few.

**ANSWER:** Wells Fargo admits that Diageo is a producer and supplier of well-known alcohol brands, but lacks sufficient knowledge or information with which to admit or deny the remaining allegations of such paragraph and on that basis denies each and every other allegation of the paragraph.

      11.    Defendant Lois I. Brady is the duly appointed Trustee for the Chapter 7 estate of Fairn & Swanson, Inc. and in that capacity is the proper party in interest to defend against the relief requested herein. The Trustee may be served with process where she regularly conducts business pursuant to Rule 7004(b)(1) by first class mail as follows: Lois I. Brady, Chapter 7 Trustee, P.O. Box 12425, Oakland, CA 94604.

**ANSWER:** Wells Fargo admits the allegation of Paragraph 11 of the Complaint.

      12.    Defendant Wells Fargo provided funding to Debtor pre-petition pursuant to various loan documents that describe a blanket security interest in all property of the Debtor. Wells Fargo, an insured depository institution, has appeared in the Bankruptcy Case by its attorney, and therefore may be served by its attorney pursuant to Rule 7004(h)(1) by first class mail as follows: Jonathan Doolittle, Pillsbury Winthrop Shaw Pittman, LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111. BACKGROUND

**ANSWER:** Wells Fargo admits the allegations of Paragraph 12 of the Complaint.

5

4827-5759-5083.v1

13.    On June 2, 2020 (the "**Petition Date**"), Debtor filed chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern District of California, Oakland Division.

**ANSWER:**    Wells Fargo admits the allegations of Paragraph 13 of the Complaint.

14.    Prior to filing bankruptcy, Debtor was in the business of selling and supplying duty free products to duty free shops through two distribution channels: (1) Duty free shops near the U.S./Mexico border, and (2) marine vessels such as cruise ships.

**ANSWER:**    Wells Fargo admits the allegations of Paragraph 14 of the Complaint.

15.    Diageo granted Debtor a non-exclusive license to sell Diageo Products in these distribution channels.

**ANSWER:**    Answering Paragraph 15 of the Complaint, Wells Fargo states that the distribution agreements between Diageo and Debtor speak for themselves and that the allegations of Paragraph 15 are legal conclusions; and on that basis Wells Fargo denies the allegations of Paragraph 15.

16.    Diageo, together with its parent company, Diageo plc, has a collection of over 200 brands of trademarked spirits and beer, many of which are produced in and shipped from the UK, and sold in more than 180 countries around the world.

**ANSWER:**    Wells Fargo admits that Diageo is a producer and supplier of alcohol brands, but lacks sufficient knowledge or information with which to admit or deny the remaining allegations of such paragraph and on that basis denies each and every other allegation of the paragraph.

17.    Diageo is very selective with whom it does business in order to protect its global reputation, goodwill, brand recognition and integrity, and to prevent market saturation in certain territories. To further these goals, Diageo tailors its distribution agreements to narrowly authorize the use of its intellectual property (including trademarks) in connection with the sale of its products.

**ANSWER:**    Wells Fargo states that the distribution agreements between Diageo and Debtor speak for themselves and that Wells Fargo lacks sufficient knowledge or information with which to admit or

6

deny the remaining allegations of such paragraph and on that basis denies each and every allegation of the paragraph.

      18.    On April 25, 2007, certain Diageo entities and Debtor entered into a "Distribution Agreement relating to Duty Free Market U.S./Mexico Border" (the "**Mexico Border Distribution Agreement**"). Then on May 1, 2013, Diageo Scotland Limited and Debtor entered into a letter agreement for the distribution of duty-free spirits for resale on marine vessels such as cruise lines (the "**Marine Distribution Agreement,**" and together with the Mexico Border Distribution Agreement, the "**Diageo Products Distribution Agreements**")[1].

**ANSWER:**    Wells Fargo admits the first sentence, but lacks sufficient knowledge or information with which to admit or deny the remaining allegations of Paragraph 18 and on that basis denies each and every other allegation of the paragraph.

      19.    The Diageo Products Distribution Agreements were amended from time-to-time, but the material terms of the core business relationship between Diageo and the Debtor remained constant since its inception.

**ANSWER:**    Wells Fargo lacks sufficient knowledge or information with which to admit or deny the allegations of Paragraph 19 and on that basis denies each and every other allegation of the paragraph.

      20.    The Mexico Border Distribution Agreement governs all transactions between the parties with respect to Diageo Products to be sold at duty free shops on the U.S./Mexico border. It provides, among other things, that Diageo would:

      (a)    Supply Debtor with duty free spirits for resale in a specified territory;[2] and

      (b)    Authorize Debtor to use the certain trademarks in connection with the sale of its products in the specified territory.[3]

In exchange, Debtor agreed to, among other things:

---

[1] Pursuant to an intercompany agreement, Diageo Brands BV handles invoicing and collection on behalf of Diageo Scotland Limited under the Marine Distribution Agreement.

[2] The specified territory is defined as duty free shops on the U.S./Mexico border. See generally, Mexico Border Distribution Agreement, at 7, ¶2.

[3] Id. at 18-19, ¶17.

7

(a)      Pay for all products within 90 days:[4]

(b)      Ensure that any reference or use of any trademark or IP owned by Diageo would only be used after Diageo's written approval;[5]

(c)      Refrain from assigning all or any part of the rights outlined in the Mexico Border Distribution Agreement to any third party;[6]

(d)      Promptly notify Diageo of any suspected infringement of the Distributor Parties' IP within the specified market territory in order for Diageo to defend or control such action.[7]

**ANSWER:**    Wells Fargo states that the Mexico Border Distribution Agreement speaks for itself and denies any allegations inconsistent with it.

21.    The Mexico Border Distribution Agreement also provides that Diageo may terminate the Mexico Border Distribution Agreement if the Debtor is wound up, dissolved or goes into liquidation.[8] If Diageo does terminate the Mexico Border Distribution Agreement, Diageo is entitled to repossess the products under the terms of that agreement, and the Debtor is no longer permitted to use the license to sell any products.[9]

**ANSWER:**    Wells Fargo states that the Mexico Border Distribution Agreement speaks for itself and denies any allegations inconsistent with it and that the allegations of Paragraph 21 are legal conclusions and not a complete statement of United States law on the subject, and affirmatively states that neither the Trustee nor any subsequent purchaser needs a license from Diageo to sell the products because the products are genuine goods in which Diageo's trademark rights have been exhausted by the sale to Debtor; and on that basis Wells Fargo denies the allegations of Paragraph 21.

22.    The Mexico Border Distribution Agreement is a trademark license that contains the provisions necessary to establish the

---

[4] Mexico Border Distribution Agreement, at 9, ¶4.

[5] Id. at 18-19, ¶17.

[6] Id at 24, ¶21.

[7] Id. at 20, ¶17.8.

[8] Mexico Border Distribution Agreement at 21 ¶18.2.2.

[9] Mexico Border Distribution Agreement at 23 ¶19.2.1 and ¶19.2.6.1

8

4827-5759-5083.v1

Debtor's use of the Diageo trademarks, including the right to use the trademarks, and the requirement that the Debtor only use the trademarks for the purposes of performing its obligations under the Diageo Products Distribution Agreements.

**ANSWER:**    Wells Fargo states that the Mexico Border Distribution Agreement speaks for itself and denies any allegations inconsistent with it and that the allegations of Paragraph 22 are legal conclusions and not a complete statement of United States law on the subject, and affirmatively states that neither the Trustee nor any subsequent purchaser needs a license from Diageo to sell the products because the products are genuine goods in which Diageo's trademark rights have been exhausted by the sale to Debtor; and on that basis Wells Fargo denies the allegations of Paragraph 22.

23.    The Marine Distribution Agreement contained many of the same provisions.[10]

**ANSWER:**    Wells Fargo states that the Marine Distribution Agreement speaks for itself and denies any allegations inconsistent with it.

24.    The Diageo Products Distribution Agreements also incorporate by reference Diageo's standard conditions of sale (the "**Diageo General Conditions of Sale**").[11] The Diageo General Conditions of Sale provided standard terms that were not specifically tailored to Diageo's business relationship with Debtor, but nonetheless supplemented the terms of the Diageo Products Distribution Agreements to the extent the standard terms were consistent with and did not contradict the specifically negotiated terms in the Diageo Products Distribution Agreements.[12]

**ANSWER:**    Wells Fargo states that the Diageo Products Distribution Agreements speak for themselves and that the allegations of Paragraph 24 are legal conclusions, and on these bases Wells Fargo denies the allegations of Paragraph 24.

A.    The Diageo Products Distribution Agreements are governed by English law.

---

[10] Marine Distribution Agreement, at 1-2 and Appx. I.
[11] Mexico Border Distribution Agreement, at 25, ¶22.2; Marine Distribution Agreement, at Appx. I.
[12] Mexico Border Distribution Agreement, at 11, ¶4.17; Marine Distribution Agreement, at 1.

9

25.    The writings that comprise the Diageo Products Distribution Agreement all contain a choice of law provision stipulating that the law or England (or England and Wales[13]) shall govern the contracts and related disputes.

**<u>ANSWER:</u>**    Wells Fargo states that the Diageo Products Distribution Agreements speak for themselves and that the allegations of Paragraph 25 are legal conclusions, and on these bases Wells Fargo denies the allegations of Paragraph 25.

26.    The Mexico Border Distribution Agreement contains the following choice of law clause:

> 27 GOVERNING LAW AND JURISDICTION
> The creation performance and termination of this Agreement shall be governed by the laws of England and the parties hereto submit to the exclusive jurisdiction of the High Court of Justice located in London

**<u>ANSWER:</u>**    Wells Fargo admits the allegation in Paragraph 26.

27.    The Amendment to the Mexico Border Distribution Agreement contains the following choice of law clause:

> 5 GOVERNING LAW
> This Amendment shall be governed and construed in accordance with the laws of England and Wales.

**<u>ANSWER:</u>**    Wells Fargo admits the allegation in Paragraph 27.

28.    The Marine Distribution Agreement contains the following choice of law clause:

> This agreement is governed by and shall be interpreted in accordance with English law.

**<u>ANSWER:</u>**    Wells Fargo admits the allegation in Paragraph 28.

29.    The Diageo General Conditions of Sale attached to the Marine Distribution Agreement contains the following choice of law clause:

> 12 GOVERNING LAW AND JURISDICTION

---

[13] Choice of law of England v. England and Wales is a distinction without a difference as England and Wales share a common legal system within the UK. *See* Timothy H. Jones, *Wales, Devolution and Sovereignty*, Statute L. Rev., Vol. 33, no. 2, pg. 151 (UK 2012) ("There are three separate legal orders (England and Wales, Scotland and Northern Ireland), each supported by a separate legal system and court structure.").

10

4827-5759-5083.v1

> These General Conditions and any Contract and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with English law and the parties submit irrevocably to the non-exclusive jurisdiction of the English courts. For the avoidance of doubt, the provisions of the Vienna Convention on the International Sale of Goods shall not apply to any Contract. In the event that these General Conditions or any Contract of which these General Conditions form part are translated into another language the English language version shall prevail.

**ANSWER:** Wells Fargo lacks sufficient knowledge or information with which to admit or deny the allegations of Paragraph 29 and on that basis denies each and every allegation of the paragraph.

30.     Moreover, each Diageo invoice issued in conjunction with an order from the Debtor has a choice of law provision substantively identical to the choice of law provision in the Diageo General Conditions of Sale. For example, the invoices issued for shipments under the Mexico Border Distribution Agreement provide that the "General Conditions [of sale] and any Contract shall be governed by English law and the parties submit irrevocably to the exclusive jurisdiction of the English courts[,]" and the invoices issued for shipments under the Marine Distribution Agreement similarly provide that the "General Conditions [of sale] and any Contract and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with English law and the parties submit irrevocably to the exclusive jurisdiction of the English courts."

**ANSWER:** Wells Fargo lacks sufficient knowledge or information with which to admit or deny the allegations of Paragraph 30 and on that basis denies each and every allegation of the paragraph.

31.     So, every document that passed between Diageo and Debtor concerning the sale and shipment of Diageo Products consistently memorialized the parties' intent for their business relationship to be governed by English law.

**ANSWER:** Wells Fargo lacks sufficient knowledge or information with which to admit or deny the allegations of Paragraph 31 and on that basis denies each and every other allegation of the paragraph.

**B.     The Diageo Products Distribution Agreements contain express retention of title clauses that require Debtor to pay for the Diageo Products as a condition to the passage of title.**

Case: 20-04034    Doc# 5    Filed: 09/14/20    Entered: 05/14/20 19:37:42    Page 11 of 41

4827-5759-5083.v1

32.     The Mexico Border Distribution Agreement includes a reservation of title provision wherein the title to the products remains with Diageo until Debtor paid for such products[14]:

> 4.14    The title to any of the Products will not pass to the Distributor until the Company has received full payment of the price for the Products and all other amounts due from the Distributor. The Company will be entitled at any time to enter the premises of the Distributor and remove any Products in respect of which title has not passed to the Distributor.

**ANSWER:**     Wells Fargo admits that section 4.14 of the Mexico Border Distribution Agreement is quoted in Paragraph 32. Answering further, Wells Fargo states that the Mexico Border Distribution Agreement speaks for itself and that the allegations of Paragraph 32 include legal conclusions, and on these bases Wells Fargo denies the remaining allegations of Paragraph 32.

33.     Similarly, the Diageo General Conditions of Sale incorporated into the Marine Distribution Agreement, states:

> 4 RISK AND TITLE
> …
> 4.2 Notwithstanding delivery and the passing of risk in the Products or any other provision of these General Conditions, legal and beneficial title in the Products shall not pass to the Customer until the Seller has received payment in full in cash or cleared funds of all amounts owing to the Seller by the Customer on any account whatever.
> …
> 4.4 Until title in the Products passes to the Customer, the Seller may at any time require the Customer to deliver up the Products to the Seller or as the Seller may direct and, if the Customer fails to do so forthwith, enter any premises of the Customer or any third party where the Products are stored and repossess the Products. The Customer will provide or procure the provision of access for the Seller to these premises so that the Seller may repossess the Products.
> …
> 4.7 The Customer may not in any way pledge or charge by way of security for any indebtedness any Products in which title has not passed to the Customer and if the Customer does or purports to do so all monies owing by the Customer to the Seller shall (without prejudice to any other rights or remedies of the Seller) become due and payable immediately.

---

[14] *Id*. at 11 ¶4.14.

4827-5759-5083.v1

**ANSWER:** Wells Fargo lacks sufficient knowledge or information with which to admit or deny the allegations of Paragraph 33 and on that basis denies each and every allegation of the paragraph.

> 34. English law has a rich tradition in international trade as it has a long history of being selected as the governing law in transnational sales contracts, and as a result England has a well-developed body of reputable jurisprudence on this topic. It is unsurprising then that the Diageo Products Distribution Agreements are governed by English law, particularly given the close connection between Diageo and the UK, where it is headquartered and where the production of many of its trademarked goods originate.

**ANSWER:** Wells Fargo lacks sufficient knowledge or information with which to admit or deny the allegations of Paragraph 34 and on that basis denies each and every allegation of the paragraph.

**C.** **Debtor is Holding Over $4 Million of Diageo Products that Diageo Still Owns.**

> 35. According to the Debtor's own records, it owes Diageo $4,564,179.76.[15] Diageo's proofs of claim have the cumulative unpaid total as $4,175,399.41.[16]

**ANSWER:** Wells Fargo admits the allegations contained in Paragraph 35.

## CAUSES OF ACTION

**A.** **Count 1 – Declaratory judgment that Diageo Products are not property of the Estate because Debtor has not satisfied the explicit condition precedent under the parties' contracts and English law to obtain title.**

> 36. Diageo repeats and realleges the allegation set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

**ANSWER:** Wells Fargo repeats and incorporates its answers to each of the preceding paragraphs of the Complaint as if fully set forth herein.

> 37. Pursuant to 11 U.S.C. § 541(a)(1), property of the Estate includes all legal and equitable interests of Debtor and property of Debtor as of the commencement of the case. As of the Petition Date, Debtor was in possession of the Diageo Products.

---

[15] *See* Amended Schedules, Dkt. No. 37, pg. 28 at §§ 3.80 and 3.81.
[16] *See* Proofs of Claim 104 and 105.

13

**ANSWER:** Wells Fargo admits the allegations contained in Paragraph 37.

    38.    Under English law, and the contracts that govern the business relationship between Diageo and Debtor, ownership of the Diageo Products, meaning legal and beneficial title, remains with Diageo because Debtor has not paid for the goods, and has therefore failed to satisfy the valid condition to obtain title.

**ANSWER:** Answering Paragraph 38 of the Complaint, Wells Fargo states that the distribution agreements between Diageo and Debtor speak for themselves and that the allegations of Paragraph 38 are legal conclusions; and on that basis Wells Fargo denies the allegations of Paragraph 38. Wells Fargo affirmatively states that the goods have been delivered to and are in the possession of the Debtor, and that United States law treats retention of title clauses as nothing more than an unperfected security interest in favor of the seller. Wells Fargo further answers that the Court should declare that the laws of the United States governs the title and priority and perfection of security interests in the products that are in Debtor's possession and constitute Wells Fargo's Collateral, and that UCC § 2-401 governs the legal effect of the title retention clauses of sales contracts through which products that were sold to, delivered to and are in the possession of Debtor, and constitute the Collateral.

    39.    An actual controversy and dispute exists between Diageo and the Trustee as to the Estate's interest in the Diageo Products, Diageo's legal and beneficial ownership of the Diageo Products, the applicability of the automatic stay and Diageo's right to seek turnover of the Diageo Products.

**ANSWER:** Wells Fargo admits the allegations contained in Paragraph 39.

    40.    A present adjudication of this controversy is necessary to guide the parties' future conduct in this proceeding. This Court has the authority, pursuant to 28 U.S.C. § 2201 and FED R. BANKR. P. 7001(1) and (9), to adjudicate this controversy.

**ANSWER:** Wells Fargo denies that this Court must adjudicate this Adversary Proceeding before approving the Sale Motion. Answering further, this paragraph states legal conclusions and on that basis Wells Fargo denies the allegations of the paragraph.

14

4827-5759-5083.v1

41. Section 2201 of the Judicial Code provides, in pertinent part, the following:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.

**ANSWER:** Wells Fargo states that 28 U.S.C. § 2201 speaks for itself and states further that the allegations of Paragraph 41 are legal conclusions and on these bases Wells Fargo denies the allegations of the paragraph.

42. Bankruptcy Rule 7001(1) and (9) requires that a proceeding to recover property and to obtain a declaratory judgment on such determination is required to be in the form of an adversary proceeding.

**ANSWER:** Wells Fargo states that Bankruptcy Rule 7001(1) and (9) speak for themselves and states further that the allegations of Paragraph 42 are legal conclusions and on these bases Wells Fargo denies the allegations of the paragraph.

43. Pursuant to the parties' agreements, legal and beneficial title to the Diageo Products was never conveyed to the Debtor, and the Diageo Products should not be property of the Estate.

**ANSWER:** Wells Fargo denies the allegations of Paragraph 43.

[i.] **Diageo and Debtor chose English law to govern the Diageo Products Distribution Agreements, so that choice of law provides the framework for the parties' respective rights and interests in the Diageo Products.**

44. The parties' business relationship is governed by the Diageo Products Distribution Agreements pursuant to which Debtor would purchase the Diageo Products for resale in duty free shops near the U.S./Mexico border and marine vessels such as cruise ships. As agreed between the parties, payment was a condition precedent to the passage of title in the Diageo Products. The Diageo Products Distribution Agreements provide the framework for the parties' rights and interests in the Diageo Products, which is critical to determining the scope of the Debtor's interests in property since property rights arise from

15

4827-5759-5083.v1

underlying substantive law and are not created by virtue of Section 541 of the Bankruptcy Code. *See Perry v. Chase Auto Fin. (In re Perry)*, Nos. 1:09-bk-11476-GM, 1:10-ap-01043-GM, 2014 Bankr. LEXIS 1659, at *31 (Bankr. C.D. Cal. Apr. 16, 2014) citing *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (U.S. 1979) (The estate's rights and interests under Section 541 are determined under applicable non-bankruptcy law.). In this case, English law is the underlying substantive law that governs the issue of property rights.

**ANSWER:** Wells Fargo states that the allegations of Paragraph 44 are legal conclusions and not an entire statement of United States law on the subject; and on these bases Wells Fargo denies the allegations of the paragraph. Answering further, Wells Fargo denies that the Diageo Production Distribution Agreements provide the framework for its rights and interests in the Diageo Products. Wells Fargo further answers that the Court should declare that the laws of the United States governs the title and priority and perfection of security interests in products that are in Debtor's possession and constitute Wells Fargo's Collateral, and that UCC § 2-401 governs the legal effect of the title retention clauses of sales contracts through which products that were sold to, delivered to and are in the possession of Debtor, and constitute the Collateral. *See* 2 Hawkland UCC Series § 2-401:2; *Usinor Industeel v. Leeco Steel Products, Inc.*, 209 F. Supp. 2d 880 (N.D. Ill. 2002); *In re Aleris Intern Inc.*, 456 B.R. 35 (Bankr. D. Del. 2011); *Hong Kong and Shanghai Banking Corp., Ltd. v. HFH-USA-Corp. ("HSBC")*, 805 F. Supp. 133 (W.D.N.Y. 1992); *In re The Charter Co.*, 49 B.R. 513 (Bankr. M.D. Fla. 1985).

45.     The writings that comprise the parties' contractual relationship, including the Diageo Products Distribution Agreements, contain a choice of law provision stipulating that the law of England (or England and Wales) shall govern the contracts and related disputes. This contractual choice of law agreed to by the parties is valid and should be enforced by the Court.

**ANSWER:** Wells Fargo states that the Diageo Products Distribution Agreements speak for themselves, denies that Wells Fargo has a contractual relationship with Diageo, states that the

16

allegations in Paragraph 45 state legal conclusions and therefore denies the allegations of this paragraph. Wells Fargo further answers that the Court should declare that the laws of the United States governs the title and priority and perfection of security interests in products that are in Debtor's possession and constitute Wells Fargo's Collateral, and that UCC § 2-401 governs the legal effect of the title retention clauses of sales contracts through which products that were sold to, delivered to and are in the possession of Debtor, and constitute the Collateral. *See* 2 Hawkland UCC Series § 2-401:2; *Usinor*, 209 F. Supp. 2d at 886; *HSBC*, 805 F. Supp. at 139-40.

> 46. Courts in the Ninth Circuit have analyzed the validity of choice of law clauses under *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972), in which the Supreme Court stated that courts should enforce choice-of-law and choice-of-forum clauses in cases of "freely negotiated private international agreements." *Batchelder v. Nobuhiko Kawamoto*, 147 F.3d 915, 918 (9th Cir. 1998) (citing *The Bremen*, 407 U.S. at 12-13); *see also Richards v. Lloyd's of London*, 135 F.3d 1289, 1294 (9th Cir. 1998) (en banc) (applying U.S. Supreme Court law to find English choice of law and forum clause enforceable).

**ANSWER:**    Wells Fargo states that the allegations of Paragraph 46 are legal conclusions and not an entire statement of United States law on the subject; and on that basis Wells Fargo denies the allegations of the paragraph. Wells Fargo further answers that the Court should declare that the laws of the United States governs the title and  priority and perfection of security interests in products that are in Debtor's possession and constitute Wells Fargo's Collateral, and that UCC § 2-401 governs the legal effect of the title retention clauses of sales contracts through which products were sold to, delivered to and are in the possession of Debtor, and constitute the Collateral. *See* 2 Hawkland UCC Series § 2-401:2; *Usinor*, 209 F. Supp. 2d at 886; *HSBC*, 805 F. Supp. at 139-40.

17

4827-5759-5083.v1

47. The Supreme Court in *Bremen* voiced a strong public policy in favor of recognizing international choice of forum and law[17] provisions, reasoning that "the elimination of all [] uncertainties [regarding the forum] by agreeing in advance . . . is an indispensable element in international trade, commerce, and contracting." *The Bremen*, 407 U.S. at 12-13. *See also Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 517 n. 11 (1974) (The Supreme Court has further explained that, in the context of an international agreement, there is "no basis for a judgment that only United States laws and United States courts should determine this controversy in the face of a solemn agreement between the parties that such controversies be resolved elsewhere.").

**ANSWER:** Wells Fargo states that the allegations of Paragraph 47 are legal conclusions and not an entire statement of United States law on the subject; and on that basis Wells Fargo denies the allegations of the paragraph. Wells Fargo further answers that the Court should declare that the laws of the United States governs the title and priority and perfection of security interests in products that are in Debtor's possession and constitute Wells Fargo's Collateral, and that UCC § 2-401 governs the legal effect of the title retention clauses in sales contracts through which products that were sold to, delivered to and are in the possession of Debtor, and constitute the Collateral. *See* 2 Hawkland UCC Series § 2-401:2; *Usinor*, 209 F. Supp. 2d at 886; *HSBC*, 805 F. Supp. at 139-40.

48. This federal common law recognition of parties' contractual choice of law in the context of international commercial contracts is consistent with other relevant authorities. *See* Restatement (2d) of Conflict of Laws 187(1) ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."); Uniform Commercial Code 1-301(a) ("Except as otherwise provided in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either

---

[17] While the contract in *Bremen* did not contain a choice of law clause, the Supreme Court explicitly recognized that the forum selection clause also acted as a choice of law clause. *Id*. at 13 n.15 ("While the contract here did not specifically provide that the substantive law of England should be applied, it is the general rule in English courts that the parties are assumed, absent a contrary indication, to have designated the forum with the view that it should apply its own law. . . . It is therefore reasonable to conclude that the forum clause was also an effort to obtain certainty as to the applicable substantive law.").

18

4827-5759-5083.v1

of this state or of such other state or nation shall govern their rights and duties"); Hague Conference on Private International Law Principles on Choice of Law in International Commercial Contracts (US and UK are members) ("At their core, the Hague Principles are designed to promote party autonomy in international commercial contracts. By acknowledging that parties to a contract may be best positioned to determine which set of legal norms is most suitable for their transaction, party autonomy enhances predictability and legal certainty – important conditions for effective cross-border trade and commerce.").

**ANSWER:**     Wells Fargo states that the allegations of Paragraph 48 are legal conclusions and not an entire statement of United States law on the subject; and on that basis Wells Fargo denies the allegations of the paragraph.  Wells Fargo further answers that the Court should declare that the laws of the United States governs the priority and perfection of security interests in products that are in Debtor's possession and constitute Wells Fargo's Collateral, and that UCC § 2-401 governs the legal effect of the title retention clauses in sales contracts through which products that were sold to, delivered to and are in the possession of Debtor, and constitute the Collateral.  *See* 2 Hawkland UCC Series § 2-401:2; *Usinor*, 209 F. Supp. 2d at 886 (a court must separate out the choice of law governing the sales contract from the need to "[l]ook[] to domestic law to determine the effect of [the seller's] retention of title clause in light of a third party claim…."); *HSBC*, 805 F. Supp. at 139-40.  Answering further, the *HSBC* court determined that under UCC § 9-102, "the parties' freedom to stipulate the applicable law is limited." *HSBC*, 805 F. Supp. at 140.  Moreover, UCC § 1-105 provides that "[w]here one of the following provisions of this Act [referencing Section 9-102] specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflicts of laws rules) so specified." *Id.* (quoting UCC § 1-105).  Quoting the Official Commentary to § 1-105, the *HSBC* court noted further that:  "[s]ubsection (2) spells out essential limitations on the parties' right to choose the applicable law.  Especially in Article 9, parties taking a security interest or asked to extend credit which may be subject to a security interest must have sure

19

4827-5759-5083.v1

ways to find out whether and where to file and where to look for possible existing filings." *Id.* And UCC § 9-102 applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods… [including] to security interests created by … title retention contract …" *Id.* Accordingly, the *HSBC* court held that "regardless of the parties' stipulation of German law, this Court must look to Article 9 of the U.C.C. to identify and prioritize the interests held by HSBC and [the seller]." *Id.*

Under the UCC, the *HSBC* court found, the "retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2-401) is limited in effect to a reservation of a 'security interest.'" *Id.* Applying German law, therefore, "would violate a fundamental purpose of New York's U.C.C. Article 9: 'to create commercial certainty to rely on the specific perfection and priority rules that govern collateral within the scope of Article 9.'" *Id.* (quoting *Carlson v. Tandy Computer Leasing*, 803 F.2d 391, 394 (8th Cir. 1986)). Moreover, "title to the goods passes when the seller fulfills his obligation to deliver the goods to the place identified in the contract." *Id.* Because the buyer took title upon delivery of the goods, the buyer "possessed sufficient 'rights in the collateral' to give HSBC a security interest under U.C.C. § 9-203." *Id.* at 143. Likewise, "the interests given up by [the seller] and acquired by [the buyer] were enough to extinguish any Article 2 security interest" held by the seller. *Id.*

49.     In *Richards*, citizens and residents of the United States sued a foreign firm in California district court under federal and state securities laws. *Id*. at 1291-92. Their investment agreement contained a forum-selection clause requiring the parties to adjudicate any disputes in "the courts of England" and under "the laws of England." *Id*. at 1292. The plaintiffs argued that the forum-selection clause did not apply due to the antiwaiver provisions of the federal securities laws and the strong public policy of preserving investors' remedies under federal and state securities laws. *Id*. at 1293-94. The court rejected the plaintiffs' argument that the antiwaiver provisions barred enforcement of the forum-selection clause, holding, in effect, that the strong federal policy in favor of enforcement of such clauses

20

superseded the statutory antiwaiver provision. *Id*. at 1294-95. In reaching this conclusion, the court acknowledged the vastly different outcome under English law given the defendant's immunity for causes of action that would otherwise be available under US law, but nevertheless determined that English law offered sufficient protection. *Id*. at 1294.

**ANSWER:**     The allegations in Paragraph 49 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 48 for its further answer to Paragraph 49.

50.     Like the contract at issue in *Richards*, the Diageo Products Distribution Agreements contain valid choice of law clauses that determine the substantive law applicable to the issues of ownership, rights, and control of the Diageo Products. *See Milanovich v. Costa Crociere*, S.P.A., 293 U.S. App. D.C. 332, 954 F.2d 763, 767 (D.C. Cir. 1992) (finding if "choice-of-law provision is enforceable, we will use the law that it selects to evaluate the enforceability of the remainder of the contract terms").

**ANSWER:**     The allegations in Paragraph 50 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 48 for its further answer to Paragraph 50.

**[ii.]**     **Under English Law, Diageo retains legal and beneficial title to the Diageo Products until Debtor pays the purchase price in full.**

51.     The Diageo Products Distribution Agreements require the application English law, and therefore, the particular statutory scheme that applies to the question of ownership of goods is the UK Sale of Good Act 1979, which specifically provides for the seller's retention of title and superior right of possession until payment:

In the United Kingdom provisions for inserting reservation of title clauses can be found in the Sale of Goods Act 1979. Pursuant to section 17, property passes when the parties intend it to pass, and following section 19(1) the seller can "reserve the right of disposal of the goods until certain conditions are fulfilled ... notwithstanding the delivery of the goods to the buyer ... the property in the goods does not pass to the buyer until the conditions imposed by the seller are fulfilled". Hence the buyer may be given possession of the goods, but the seller can remain owner of them until the buyer discharges his contractual duties. The seller has the right to repossess the goods if the

21

4827-5759-5083.v1

buyer defaults. But the seller is not regaining ownership (he never transferred it), he merely regains possession of the goods.

> Giorgio Monti, Gilles Nejman, and Wolf J. Reuter, *The Future of Reservation of Title Clauses in the European Community*, 46 Int'l & Comp. L.Q. pp 866-907 (UK 1997). Thus, under English law until the agreed upon condition precedent has been satisfied the buyer owns no interest in the goods.

**ANSWER:**    The allegations in Paragraph 51 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 48 for its further answer to Paragraph 51.

> 52.    The "retention of title" concept is also explicitly incorporated into the UK's insolvency law:

"retention of title agreement" means an agreement for the sale of goods to a company, being an agreement –

> (a)    which does not constitute a charge on the goods, but

> (b)    under which, if the seller is not paid and the company is wound up, the seller will have priority over all other creditors of the company as respects the goods or any property representing the goods;

Insolvency Act 1986 (c. 45), s. 251.

**ANSWER:**    The allegations in Paragraph 52 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 48 for its further answer to Paragraph 52.

> 53.    UK courts enforce retention of title clauses in sales contracts and recognize a seller's right to reclaim goods that have not been paid for. For example, in *Clough Mill Ltd v Martin* [1984] 3 All ER 982, [1985] 1 WLR 111, the plaintiff supplied a quantity of yarn to a company called Heatherdale Fabrics Ltd on terms that the goods were to remain its property until paid for in full, although Heatherdale was granted the power to sell the goods or use them for the purpose of manufacturing products. The contract also provided that if any payment were overdue the plaintiff could recover or resell the goods and enter Heatherdale's premises for that purpose. When the defendant was appointed receiver of Heatherdale the plaintiff informed him that it wished to

22

4827-5759-5083.v1

repossess the unused yarn and asked to be allowed to collect it. The defendant refused on the grounds that the retention of title clause amounted to a security interest and was void for non-registration and proceeded to allow Heatherdale to use the yarn. On appeal, the court held that ownership (referred to as "property" in English law parlance) in the yarn had not passed to Heatherdale. Since the yarn claimed by the plaintiff was at the time of their claim identifiable, unused and unpaid for, they retained legal and beneficial title to it and were entitled to damages against the receiver for wrongfully depriving them of possession.

**ANSWER:** The allegations in Paragraph 53 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 48 for its further answer to Paragraph 53.

54. In *Armour v Thyssen Edelstahlwerke AG* [1990] 3 All ER 481, [1991] 2 AC 339 the defendant supplied steel to a manufacturing company under a contract which contained a retention of title clause. The plaintiffs, who had been appointed as receivers, brought proceedings against the supplier seeking a declaration that property in the steel had passed to the company, despite the fact that payment had not been made. The suppliers argued that the retention of title clause was effective to prevent title passing. The court agreed, referring to sections 17 and 19 of the Sale of Goods Act 1979, and held that property passed when the parties agreed that it should pass and therefore not until the goods had been paid for.

**ANSWER:** The allegations in Paragraph 54 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 48 for its further answer to Paragraph 54.

55. In *Chaigley Farms Ltd v Crawford, Kaye & Grayshire Ltd (t/a Leylands)*, [1996] BCC 957, the plaintiff supplied live animals to an abattoir under a contract which contained a retention of title clause. Both parties contemplated that the animals would or might be slaughtered before they had been paid for. When receivers were appointed over the abattoir the plaintiffs sought to enforce the retention of title clause in order to recover the remaining live animals and butchered meat which they alleged were their property. The court held that the clause related only

23

4827-5759-5083.v1

to live animals and that when they were slaughtered the plaintiffs' title to them was extinguished.

**ANSWER:** The allegations in Paragraph 55 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 48 for its further answer to Paragraph 55.

    56.    There are also numerous cases in which the receiver of an insolvent buyer agrees based on the retention clause to return unpaid goods in the possession of the insolvent buyer to the seller, thus reducing the seller's claim. *See e.g., Re BHT Group Ltd (in liquidation)*, 2015 IECA 191 (July 29, 2015) at ¶6 (reciting factual background that liquidating trustee "accepted that [goods delivered to insolvent buyer and still physically present at buyer's premises] were the subject matter of a valid retention of title clause, and [the trustee] accordingly discharged that sum [of the liquidated goods in the buyer's possession at the time of the asset sale]" to the seller); *Carroll Group Distributors Limited, Plaintiff v G and JF Bourke Limited (in Voluntary Liquidation) and Bourke (Sales) Limited (in Voluntary Liquidation)*, [1990] 1 IR 481 (affirming parties' agreement that seller was entitled to identified goods supplied to and in the possession of the insolvent buyer and the goods were returned to the seller reducing the buyer's indebtedness to the seller).

**ANSWER:** The allegations in Paragraph 56 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 48 for its further answer to Paragraph 56.

    57.    As for American courts, the recognition of contractual retention of title clauses as actually that, and not merely a reservation of a security interest, is not a completely foreign concept. In *Wave Maker Shipping Co. v. Hawkspere Shipping Co.*, 56 F. App'x 594 (4th Cir. 2003), the court determined that maritime fuel bunkers were not subject to attachment of creditor's lien because the fuel contract between debtor and fuel supplier was governed by the UK Sale of Goods Act and contained a retention of title clause, so even though debtor had possession of the bunkers, title to the bunkers had not passed from supplier to debtor because it had not paid for them. *Id.* at 595. In *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 2009 U.S. Dist. LEXIS 3095 (S.D.N.Y. Jan. 13, 2009), the court determined that the retention of title provision in the parties' distribution agreement was

24

governed by Italian law, not the California Uniform Commercial Code, so the senior perfected lienholder's claim to the inventory was subordinate to the supplier's absolute title claim under Italian law. *Id*. at *34. Finally, in *Usinor Industeel v. Leeco Steel Prods.*, 209 F. Supp. 2d 880, 886 (N.D. Ill. 2002), while the court ultimately determined that the Illinois Uniform Commerical Code applied to the international sale of goods contract that did not contain a choice of law clause, which required the court to engaged in a "most significant contacts" analysis, it acknowledged that the result would be different if French law had applied because "under French law, the seller of goods has an absolute right to contract for title until payment." *Id*. at 866.

**ANSWER:**    The allegations in Paragraph 57 state legal conclusions and on that basis Wells Fargo denies them.  Wells Fargo incorporates its answer to Paragraph 48 for its further answer to Paragraph 57.  Answering further, *Usinor* and *HSBC* resolve any possible claim by Diageo that the Court should apply the choice of English law under the Distribution Agreement to determine the impact of the title retention provision and priority of security interests in the Products.  Wells Fargoshould be entitled to rely on its lien searches to determine whether there were any prior perfected security interest in the products before lending money to Debtor secured by Debtor's pledge of those assets  Because Diageo failed to perfect its purchase money security interest, it cannot now complain that its interest is lower in priority than Wells Fargo's prior perfected security interest.

Diageo's reliance on *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,* Case No. 07 CIV 9580 (HB), 2009 WL 89115 (S.D.N.Y. Jan. 14, 2009), does not alter this analysis but in fact supports Wells Fargo's claim that its security interest in the products prevails.  The *Greystone* opinion to which Diageo cites was a ruling, in part, on a motion to reconsider and merely "adopts the reasoning set forth in its prior opinion on Plaintiffs' motion for a preliminary injunction to the effect that Italian law, and not the UCC, applies to the Distribution Agreement pursuant to the choice-of-law clause and therefore the retention of title provision must be given effect." *Id*. at *10 (citing *Diesel Props S.r.l. v. Greystone Business Credit II LLC,* No. 07 Civ 9580, 2008 WL 594773, at *3-5 (S.D.N.Y. Mar. 5, 2008))

Case: 20-04034    Doc# 5    Filed: 09/14/20    Entered: 05/14/20 19:37:42    Page 25 of 41

4827-5759-5083.v1

("Greystone I").  In *Greystone I*, the court reached its conclusion only after distinguishing *HSBC* in a manner that has no application to the present controversy.

There, Greystone was not a "stranger" to the distribution agreement like HSBC and Wells Fargo.  Instead, the seller entered into separate agreements with the lender Greystone (the "Tripartite Agreements"), under which the seller would actually invoice *Greystone* for goods shipped, and then *Greystone* undertook a contractual obligation to pay the seller.  *Greystone I* at *2.  The Tripartite Agreements also specifically referred to the distribution agreement.  *Id.*  In fact, it was Greystone's own failure to pay the seller under the Tripartite Agreements that caused the seller to terminate the distribution agreement.  *Id.*  The seller then filed the action and sought to preliminarily enjoin the subsequent sale of goods by the buyers, Greystone or others acting with them.

The *Greystone I* court distinguished *HSBC* "because here, as evidenced by the Tripartite Agreements and correspondence between the parties, Greystone was not a stranger to the Distribution Agreements." *Id.* at *4.  Here, unlike *Greystone I*, but as in *HSBC,* Wells Fargo is a stranger to the Distribution Agreement.  *Greystone I* does not apply because Wells Fargo is not party to any agreement with Diageo, much less one that required Wells Fargo to issue payments to Diageo pursuant to an agreement the Tripartite Agreements referenced in *Greystone I*.  Moreover, as in *HSBC*, Diageo delivered the products to Debtor, the products are property of the Estate, Debtor had sufficient interest in the products to have conveyed an interest to Wells Fargo, Wells Fargo perfected its Article 9 security interest in the products, and Diageo failed to perfect its potential security interests.  Thus, this Court should follow *Usinor* and *HSBC* and apply the UCC rather than English law to resolve not only the parties' respective rights under the distribution agreements, but also Wells Fargo's interest in its Collateral

> 58.  Under the parties' choice of English law, as well as pursuant to their explicit contractual agreement, Diageo retains legal and beneficial title to all Diageo Products that the Debtor has not

Case: 20-04034   Doc# 5   Filed: 09/14/20   Entered: 05/14/20 19:37:42   Page 26 of 41

Case No. 20-04034-RLE

4827-5759-5083.v1

paid for and such Diageo Products are not property of the Estate. This ownership right is superior to the bare possession had by the Debtor, and therefore Diageo seeks an order for declaratory relief stating as follows:

> (a)    The Diageo Products that have not been paid for are not property of the Estate; and

> (b)    The Trustee has no valid interest in the Diageo Products sufficient to retain possession of and sell the Diageo Products.

**ANSWER:**    The allegations in Paragraph 58 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 57 for its further answer to Paragraph 58.

**B.**    **<u>Count 2 – Declaratory judgment that Diageo's legal and beneficial title to the Diageo Products is superior to the claims of any other party, including Wells Fargo's security interest in Debtor's inventory.</u>**

> 59.    Diageo repeats and realleges the allegation set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

**ANSWER:**    Wells Fargo repeats and incorporates its answers to each of the preceding paragraphs of the Complaint as if fully set forth herein.

> 60.    Under English law, and the contracts that govern the business relationship between Diageo and Debtor, ownership of the Diageo Products, meaning legal and beneficial title, remains with Diageo because Debtor has not paid for the goods, and has therefore failed to satisfy the valid condition to obtain title. Consequently, Debtor did not have the power to convey a security interest in the Diageo Products to Wells Fargo.

**ANSWER:**    The allegations in Paragraph 60 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 57 for its further answer to Paragraph 60. Answering further, *see* Mexico Border Distribution Agreement Section 4.6 ("All Products supplied by the Company under this Agreement *will be sold FOB* named seaport (unless states otherwise) and the Distributor will be responsible for arranging and paying all costs of transport and

27

4827-5759-5083.v1

insurance from that point.") (emphasis added); and Section 4.15 ("*Risk of loss* of or damage to any of the Products supplied FOB named seaport, *will pass to the Distributor* when the goods pass the ship's rail at the port of shipment.") (emphasis added); and page 4 (defining "FOB" as: "supply terms pursuant to which the Company pays for transportation of the goods to the port of shipment and the Distributor pays for freight, insurance, unloading costs and transportation from the port of destination to the factory.") Therefore, Diageo sold the products to Debtor FOB. Thus, once the products were delivered to the named seaport, Debtor not only took possession of the products, but also assumed the risk of loss and thus took legal title to the products as well. *Semitool v. Dynamic Micro Systems Semiconductor Equipment*, No. 3:01-cv-01391-WHA, 2002 WL 34213426, at*5 n. 10 (N.D. Cal. Sept. 5, 2002) (quoting *North American Philips v. American Vending Sales, Inc.,* 35 F.3d 1576, 1578 n. 2 (Fed.Cir.1994)) ("'Free on board' is a method of shipment whereby goods are delivered at the designated location, usually a transportation depot, where legal title and thus risk of loss passes from seller to buyer.").

> 61. An actual controversy and dispute exists between Diageo and Wells Fargo as to their respective interests in the Diageo Products.

**ANSWER:** Wells Fargo admits the allegations contained in Paragraph 61.

> 62. A present adjudication of this controversy is necessary to guide the parties' future conduct in this proceeding. This Court has the authority, pursuant to 28 U.S.C. § 2201 and FED R. BANKR. P. 7001(2) and (9), to adjudicate this controversy.

**ANSWER:** Wells Fargo denies that this Court must adjudicate this Adversary Proceeding before approving the Sale Motion and that the paragraph states legal conclusions and on these bases denies the allegations of the paragraph.

> 63. Section 2201 of the Judicial Code provides, in pertinent part, the following:

28

4827-5759-5083.v1

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.

**ANSWER:** Wells Fargo admits that 28 U.S.C. § 2201 speaks for itself and states that the allegations of Paragraph 63 are legal conclusions and on these bases Wells Fargo denies the allegations of the paragraph.

64. Bankruptcy Rule 7001(2) and (9) requires that a proceeding to determine the validity, priority, or extent of a lien or other interest in property and to obtain a declaratory judgment on such determination is required to be in the form of an adversary proceeding.

**ANSWER:** Wells Fargo admits that Bankruptcy Rule 7001(1) and (9) speak for themselves and states that the allegations of Paragraph 64 are legal conclusions and on these bases Wells Fargo denies the allegations of the paragraph.

65. The security agreement between Debtor and Wells Fargo describes a broad security interest in all of Debtor's assets, including inventory. However, before Wells Fargo's security interest could attach to collateral and be enforceable against Debtor and third parties such as Diageo, Debtor had to have rights in the collateral or the power to transfer rights in the collateral to Wells Fargo. *See* Cal. U. Com. Code § 9203(b)(2).

**ANSWER:** Wells Fargo admits the first sentence in Paragraph 65. Wells Fargo states that the second sentence is a legal conclusion and on these bases Wells Fargo denies the second sentence of the paragraph. Wells Fargo incorporates its answer to Paragraph 60 for its further answer to Paragraph 65.

66. The Debtor cannot transfer or grant a security interest in rights or property that it does not have. It follows that if the Debtor does not have title to the Diageo Products that it does not have sufficient rights in the Diageo Products or the power to transfer Diageo's rights in the Diageo Products in order to pledge the

29

4827-5759-5083.v1

Diageo Products as collateral. As explained in Count 1, under the Diageo Products Distribution Agreements, title to the Diageo Products did not convey to Debtor until they were paid for, so until that condition was satisfied, Debtor did not have sufficient rights in the Diageo Products to support the attachment of Wells Fargo's security interest. Moreover, Diageo never consented to Debtor's use of the Diageo Products as security, and the Diageo General Conditions of Sale explicitly prohibits Debtor from pledging unpaid Diageo Products as security for any indebtedness.

**ANSWER:** Wells Fargo lacks sufficient knowledge or information to admit or deny if Diageo consented to Debtor's use of the Diageo Products as security, and therefore denies that allegation. The remaining allegations in Paragraph 66 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 60 for its further answer to Paragraph 66.

67. Under the parties' choice of English law and the express terms of their agreements, Diageo retains legal and beneficial title to all Diageo Products that the Debtor has not paid for. This ownership right coupled with Diageo's lack of consent for the use of Diageo Products as security means that Debtor did not have sufficient rights in the Diageo Products for Wells Fargo's security interest to attach. Therefore, Diageo seeks an order for declaratory relief stating that Wells Fargo's security interest did not attach to the unpaid Diageo Products.[18]

**ANSWER:** The allegations in Paragraph 67 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 60 for its further answer to Paragraph 67.

C. **Count 3 – In the alternative, declaratory judgment that the Diageo Products Distribution Agreements are executory contracts that cannot be assumed and assigned without the consent of Diageo and may be terminated under applicable trademark law pursuant to 365(e).**

---

[18] Even if the court were to find that Wells Fargo had a security interest in the Diageo Products, the Diageo Products Distribution Agreements prohibit assignment of any rights in the Diageo Products Distribution Agreements and prohibits the Debtor from granting a security interest in the Diageo Products to any third party. Pursuant to Cal. U. Com. Code § 9408, the anti-assignment provisions of the Diageo Products Distribution Agreements are overridden for the limited purposes of permitting a security interest to attach and be perfected. However, Wells Fargo will not be able to use or enforce the license under the Diageo Products Distribution Agreements and will not be able to use any Diageo trademark in connection with the exercise of any remedies under the Uniform Commercial Code.

30

4827-5759-5083.v1

68. Diageo repeats and realleges the allegation set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

**ANSWER:** Wells Fargo repeats and incorporates its answers to each of the preceding paragraphs of the Complaint as if fully set forth herein.

69. Diageo owns the registered, protectable trademarks for the Diageo Products, and the sale of Diageo's trademarked goods by unauthorized distributors raises the prospect of market confusion. Therefore, the distribution of Diageo Products requires Diageo's permission to use its intellectual property including its trademarks in connection with the marketing and sale of the goods. For that reason, Diageo is very selective with the companies it allows to distribute its products.

**ANSWER:** The allegations in Paragraph 69 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 60 for its further answer to Paragraph 67. Wells Fargo affirmatively states that neither the Trustee nor any subsequent purchaser needs a license from Diageo to sell the products because the products are genuine goods in which Diageo's trademark rights have been exhausted by the sale to Debtor. Courts have long recognized that the right of a trademark owner "to control distribution of its trademarked product does not extend beyond the first sale of the product." *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995). Thus, "[r]esale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition." *Id.* The rationale for the rule "is that trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987). *See also Garmon Corp. v. HealthyPets, Inc.*, No. 518CV00809OD WSHKX, 2019 WL 2145455, at *2 (C.D. Cal. May 16, 2019) (internal citation omitted); *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61–62 (2d Cir. 1992) (internal citation omitted).

31

4827-5759-5083.v1

Here, it is undisputed that Diageo sold the products to Debtor. This first sale exhausted Diageo's trademark rights and prevents Diageo from using its trademarks to control further distribution of the Products. Indeed, numerous provisions of the Mexico Border Distribution Agreement make clear that a sale from Diageo to Debtor occurred. *See, e,g.,* Mexico Border Distribution Agreement at Section 4.1 ("*The Products sold by the Company to the Distributor* under this Agreement shall be sold at the list prices which may from time to time be established by the Company for sales to distributors.") (emphasis added); *id.* at Section 4.6 (All Products supplied by the Company under this Agreement *will be sold FOB* named seaport (unless states otherwise) and the Distributor will be responsible for arranging and paying all costs of transport and insurance from that point.") (emphasis added); *id.* at Section 4.15 ("*Risk of loss* of or damage to any of the Products supplied FOB named seaport, *will pass to the Distributor* when the goods pass the ship's rail at the port of shipment.") (emphasis added); *id.* at Section 7.1 ("The Distributor shall not *resell* the Products except in the bottles in which they are received from the Company or the Nominated Supplier and shall ensure that until resale such bottles and their contents are and remain in the same condition as when received by the Distributor from the Company …") (emphasis added); *id.* at Section 7.2 ("The Distributor will be entitled to *resell the Products to its customers* at such prices as it may determine") (emphasis added); *id.* at Section 19.2.1 ("Upon termination of the Agreement for any reason: - the Company or its nominee will be entitled (but not obliged) to *repurchase from the Distributor* any stocks of the Products in the possession of the Distributor …") (emphasis added). The fact that Diageo purported to retain title, or agreed to delayed payment terms, are insufficient to transform the transaction with Debtor into something other than a "sale" for purposes of trademark law.

In addition, the products at issue are indisputably genuine. Goods purchased from a trademark owner remain genuine as long as they have not been altered to be "materially different." *Garmon*, 2019 WL 2145455 at *2 (internal citations and quotations omitted). Diageo does not claim that the

Case: 20-04034    Doc# 5    Filed: 09/14/20    Case No. 20-04034-RLE    Entered: 05/14/20 19:37:42    Page 32 of 41

4827-5759-5083.v1

products have undergone any alteration, repackaging, reconstruction, or modification of any type—the products are exactly as Diageo itself released them into the stream of commerce. In such circumstances, consumers cannot be confused about the origin, make, or quality of the products and the doctrine of trademark exhaustion is properly applied. Because Diageo's trademark rights have been exhausted, neither the Trustee nor any subsequent purchaser needs Diageo's consent (or a license) to sell the products.

> 70. The Diageo Products Distribution Agreements contain non-exclusive intellectual property licenses that establish strict parameters for the sale of Diageo's trademarked goods for the purpose of ensuring the protection of Diageo's global reputation, goodwill, brand recognition and integrity, and to prevent market saturation in certain territories.

**ANSWER:** The allegations in Paragraph 70 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 69 for its further answer to Paragraph 70.

> 71. These circumstances give rise to an actual controversy and dispute between Diageo, the Trustee, and any prospective buyer of the Diageo Products as to their respective interests in the Diageo Products given Diageo's legally protectible intellectual property interests.

**ANSWER:** The allegations in Paragraph 71 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 69 for its further answer to Paragraph 71.

> 72. A present adjudication of this controversy is necessary to guide the parties' future conduct in this proceeding. This Court has the authority, pursuant to 28 U.S.C. § 2201 and FED R. BANKR. P. 7001(2) and (9), to adjudicate this controversy.

**ANSWER:** Wells Fargo denies that this Court must adjudicate this Adversary Proceeding before approving the Sale Motion and that the paragraph states legal conclusions and on that basis denies the allegations of the paragraph.

33

4827-5759-5083.v1

73. Section 2201 of the Judicial Code provides, in pertinent part, the following:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.

**ANSWER:** Wells Fargo admits that 28 U.S.C. § 2201 speaks for itself and states that the allegations of Paragraph 41 are legal conclusions and on that basis Wells Fargo denies the allegations of the paragraph.

74. Bankruptcy Rule 7001(2) and (9) requires that a proceeding to determine the validity, priority, or extent of a lien or other interest in property and to obtain a declaratory judgment on such determination is required to be in the form of an adversary proceeding.

**ANSWER:** Wells Fargo admits that Bankruptcy Rule 7001(1) and (9) speak for themselves and states that the allegations of Paragraph 74 are legal conclusions and on that basis Wells Fargo denies the allegations of the paragraph.

75. As previously alleged, the Diageo Products are not property of the Estate under applicable English law as well as under the explicit terms of the distribution agreements. Even if this Court finds that the Diageo Products are property of the Estate, the Trustee is precluded from using and selling the Diageo Products under both Section 365(c)(1) and 365(e)(2) of the Bankruptcy Code. The Trustee may not assume the Diageo Products Distribution Agreements without Diageo's consent under Section 365(c)(1) of the Bankruptcy Code. In addition, Diageo has the right to terminate the trademark license set forth in the Diageo Products Distribution Agreements because it is not required to accept performance from the Trustee under Section 365(e)(2) of the Bankruptcy Code.[19] If Diageo terminates the Diageo Products Distribution Agreements, Diageo has the right to repossess the Diageo Products under the terms of that

---

[19] Non-exclusive licenses for the use of intellectual property are executory contracts under the Bankruptcy Code. *In re Access Beyond Tech., Inc.*, 237 B.R. 32, 45-47 (Bankr. D. Del. 1999); *In re Golden Book Family Entm't, Inc.*, 269 B.R. 300, 309 (Bankr. D. Del. 2001).

34

4827-5759-5083.v1

agreement.[20] If the Trustee sells the Diageo Products without curing the payment default under the Diageo Products Distribution Agreements and obtaining Diageo's consent, the Trustee will be infringing on Diageo's trademarks. The same would be true of any entity that purchases the Diageo Products, unless Diageo consents. To the extent Diageo needs relief from stay to give notice of termination of the contract, upon such relief this complaint will serve as written notice under the Diageo Products Distribution Agreements that the Diageo Products Distribution Agreements are terminated, or as a request for Diageo to receive relief from stay in order to terminate the Diageo Product Distribution Agreements.

**ANSWER:** The allegations in Paragraph 75 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 69 for its further answer to Paragraph 75.

76. Section 365(c)(1) of the Bankruptcy Code generally provides that a trustee may assume or assign an executory contract whether or not the executory contract prohibits assignment. However, Section 365(c)(2) of the Bankruptcy Code provides an exception if "applicable law excuses" the non-debtor party "from accepting performance from the debtor or debtor in possession." 11 USC §365(c)(1)(A). Similarly, Section 365(e)(1) generally provides that a non-debtor counter party to an executory contract may not terminate the contract based upon the insolvency or financial condition of the debtor; and Section 365(e)(2) provides an exception to that general rule by providing that a non-debtor party may terminate an executory contract if applicable law excuses the non-debtor party from accepting performance from the trustee or an assignee of such contract. 11 USC §365(e)(2)(A). The applicable law referred to in Section 365 is any nonbankruptcy law, and trademark law is "applicable law" under Section 365 of the Bankruptcy Code. In re XMH Corp. 647 F3d 690, 697 (7th Cir 2011). Trademark licenses are personal in nature and the licensor is not required to accept performance from a third-party unless the licensor consents. Me Renee World v. Elite World LLC, 674 Appx 620, 622 (9th Circ. 2016) ("It is well established that a trademark license cannot be assigned without the consent of the owner of the mark."); N.C.P. Mktg. Group, Inc. v BG Star Prods., Inc. (In re N.C.P. Mktg. Group, Inc.), 337 BR 230, 237-238 (D Nev 2005) aff'd (9th Cir 2008) 279 Fed Appx 561 (unpublished opinion), cert denied

---

[20] Mexico Border Distribution Agreement at 23 ¶19.2.1.

35

4827-5759-5083.v1

(2009) 556 US 1145, 129 S Ct 1577 ("**NCP Marketing Group**"). Therefore, under Section 365(e)(2) of the Bankruptcy Code, because the Diageo Products Distribution Agreements are trademark licenses that prohibit assignment and permit the termination of the license upon the insolvency of the Debtor, Diageo is entitled to terminate the Diageo Products Distribution Agreements and is not required to accept performance of the Diageo Products Distribution Agreements from the Trustee. All sales of the Diageo Products by the Debtor are governed by the restrictions of the Diageo Products Distribution Agreements, and Diageo is not required to accept performance by the Trustee of those obligations under the Diageo Products Distribution Agreements because Diageo did not originally contract with the Trustee. The Diageo Product Distribution Agreements carefully limit the territory of sale and the standards and requirements for the use of its trademarked goods in order to protect its brand name consistent with a trademark license. Diageo should be permitted to terminate the Diageo Products Distribution Agreements and exercise its remedies under those agreements, including repossession of the Diageo Products. Section 365(e)(2) specifically refers to "the trustee" as being a party to whom the nondebtor party does not have to accept performance. Diageo understands that it must request relief from stay to terminate the Diageo Products Distribution Agreements and requests relief from stay in connection with this declaratory relief action.[21]

**ANSWER:** The allegations in Paragraph 76 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 69 for its further answer to Paragraph 76.

77. Even if the Court determines that the Diageo Product Distribution Agreements cannot be terminated under Section 365(e)(2) of the Bankruptcy Code, based upon Ninth Circuit law the Trustee is not able to assume the Diageo Product Distribution Agreements without Diageo's consent. Pursuant to *Perlman v Catapult Entertainment, Inc. (In re Catapult Entertainment, Inc.)* 165 F3d 747. (9th Cir 1999) ("*Catapult*"), if applicable law excuses the performance by a nondebtor party, then the trustee cannot assume or assign the contract. The Ninth Circuit has determined that the plain meaning of Bankruptcy Code §365(c)(1) requires courts to consider a "hypothetical test"

---

[21] Diageo believes that it provided judicial economies by bringing all causes of action in one adversary proceeding rather than file a separate motion for relief from stay with respect to the Diageo Products Distribution Agreements. Diageo is prepared to file a motion for relief from stay at the court's request.

36

which means that "a debtor in possession may not assume an executory contract over the nondebtor's objection if applicable law would bar assignment to a hypothetical third party, even where the debtor in possession has no intention of assigning the contract in question to a third party." *Id.* at 750. While *Catapult* involved patent law, trademark law has been determined to be applicable law within the meaning of Section 365(c)(1), including in the Ninth Circuit. *N.C.P. Marketing Group, Inc* 337 BR at 237; see also, *In re XMH Corp.* 647 F3d 690 (7th Cir 2011) (trademark licenses not assignable without clause expressly authorizing assignment); *Wellington Vision, Inc. v Pearle Vision, Inc. (In re Wellington Vision, Inc.)* 364 BR 129 (SD Fla 2007); *In re Trump Entertainment Resorts, Inc.* 526 BR 116 (Bankr Del 2015). The analysis using trademark law as outlined in *NCP Marketing* is the same as in *Catapult;* once it is determined that the contract cannot be assigned, the Trustee cannot use the contract if the nondebtor party does not consent. Diageo has not consented to the Trustee assuming the Diageo Product Distribution Agreements, and because the Diageo Product Distribution Agreements are trademark licenses, the Trustee is not permitted to use the license provided under the Diageo Product Distribution Agreements to sell the Diageo Products.

**ANSWER:** The allegations in Paragraph 77 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 69 for its further answer to Paragraph 77.

78. For these reasons, Diageo may terminate the Diageo Products Distribution Agreements under the ipso facto clause contained in each agreement, pursuant 11 U.S.C. 365(e). Upon termination the Trustee will not be able to sell the Diageo Products and Diageo may repossess all Diageo Products. In addition, the Diageo Product Distribution Agreements may not be assumed or assigned by the Trustee. Under the reasoning of Catapult, the Trustee currently does not have the right to use the trademark license or the right to use or sell the Diageo Products, unless Diageo consents. Under either analysis, the Trustee may not sell the Diageo Products under the Diageo Product Distribution Agreements.

**ANSWER:** The allegations in Paragraph 78 state legal conclusions and on that basis Wells Fargo denies them. Wells Fargo incorporates its answer to Paragraph 69 for its further answer to Paragraph

37

Case: 20-04034   Doc# 5   Filed: 09/14/20   Entered: 05/14/20 19:37:42   Page 37 of 41

4827-5759-5083.v1

78.  Diageo does not explain how it would harmonize its interpretation of contractual provisions as barring sale of the products, in effect creating a consignment agreement, with the contract provisions cited above confirming that the products were sold to Debtor in the first instance, that Debtor bore the risk of loss and could resell the products at its discretion at any price it chose, and that on termination of the Mexico Border Distribution Agreement Diageo had the option to repurchase the Products (rather than the right to retake possession based on allegedly retaining legal title.  The only construction the Mexico Border Distribution Agreement that gives meaning to all of these provisions requires the Court to conclude that the provisions Diageo relies upon do not prevent Debtor from selling the Products subject to whatever rights Diageo's claims in sale proceeds.

## AFFIRMATIVE DEFENSE NO. 1

Diageo's claim in Count 1 that English law governs the effect of the title retention provision of the distribution agreements is precluded by UCC § 2-401 because the goods have been delivered to and are in the possession of the Debtor, and UCC § 2-401 retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer constitutes only a reservation of a security interest.

## AFFIRMATIVE DEFENSE NO. 2

Diageo's claim in Count 2 that Diageo's asserted legal and beneficial title to the Collateral is superior to Wells Fargo's undisputed security interest in the products sold to, delivered to and in the possession of the Debtor, and that constitute the Collateral, is governed and barred by Article 9 of the UCC.  Wells Fargo has the prior perfected security interest in the products Diageo sold and delivered to Debtor and which constitute the Collateral.

4827-5759-5083.v1

Pursuant to UCC § 9-102, "the parties' freedom to stipulate the applicable law is limited." *HSBC*, 805 F. Supp. at 140.  Moreover, UCC § 1-105 provides that "[w]here one of the following provisions of this Act [referencing Section 9-102] specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflicts of laws rules) so specified." *Id.* (quoting UCC § 1-105).  Quoting the Official Commentary to § 1-105, the *HSBC* court noted further that:  "[s]ubsection (2) spells out essential limitations on the parties' right to choose the applicable law.  Especially in Article 9, parties taking a security interest or asked to extend credit which may be subject to a security interest must have sure ways to find out whether and where to file and where to look for possible existing filings." *Id.*  And UCC § 9-102 applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods… [including] to security interests created by … title retention contract …" *Id.*  Accordingly, regardless of the parties to the Mexico Border Distribution Agreement's selection of English law, this Court must look to Article 9 of the U.C.C. to identify and prioritize the interests held by Wells Fargo and Diageo in the products that constitute the Collateral.  *Id.*

Applying English law, therefore, "would violate a fundamental purpose of … U.C.C. Article 9:  'to create commercial certainty to rely on the specific perfection and priority rules that govern collateral within the scope of Article 9.'" *Id.* (quoting *Carlson v. Tandy Computer Leasing*, 803 F.2d 391, 394 (8th Cir. 1986)).  Moreover, "title to the goods passes when the seller fulfills his obligation to deliver the goods to the place identified in the contract." *Id.*  Because Debtor took title upon delivery of the goods, Debtor "possessed sufficient 'rights in the collateral' to give [Wells Fargo] a security interest under U.C.C. § 9-203." *Id.* at 143.  Likewise, "the interests given up by [Diageo] and acquired by [Debtor] were enough to extinguish any Article 2 security interest" held by Diageo.  *Id.*  Finally,

Case: 20-04034   Doc# 5   Filed: 09/14/20   Entered: 05/14/20 19:37:42   Page 39 of 41

4827-5759-5083.v1

Diageo is barred from claiming a security interest in the Collateral because it failed to file a UCC financing statement to perfect its alleged security interest in the Collateral.

## AFFIRMATIVE DEFENSE NO. 3

Diageo's claim in Count III is barred by the first sale doctrine. Neither the Trustee nor any subsequent purchaser needs a license from Diageo to sell the products because the products are genuine goods in which Diageo's trademark rights have been exhausted by the sale to Debtor. Courts have long recognized that the right of a trademark owner "to control distribution of its trademarked product does not extend beyond the first sale of the product." *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995). Thus, "[r]esale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition." *Id.* Here, it is undisputed that Diageo sold the products to Debtor. This first sale exhausted Diageo's trademark rights and prevents Diageo from using its trademarks to control further distribution of the Products. Indeed, numerous provisions of the Mexico Border Distribution Agreement make clear that a sale from Diageo to Debtor occurred. *See, e.g.,* Mexico Border Distribution Agreement at Section 4.1 ("*The Products sold by the Company to the Distributor* under this Agreement shall be sold at the list prices which may from time to time be established by the Company for sales to distributors.") (emphasis added); *id.* at Section 4.6 (All Products supplied by the Company under this Agreement *will be sold FOB* named seaport (unless states otherwise) and the Distributor will be responsible for arranging and paying all costs of transport and insurance from that point.") (emphasis added); *id.* at Section 4.15 ("*Risk of loss* of or damage to any of the Products supplied FOB named seaport, *will pass to the Distributor* when the goods pass the ship's rail at the port of shipment.") (emphasis added); *id.* at Section 7.1 ("The Distributor shall not *resell* the Products except in the bottles in which they are received from the Company or the Nominated Supplier and shall ensure that until resale such bottles

40

and their contents are and remain in the same condition as when received by the Distributor from the Company …") (emphasis added); *id.* at Section 7.2 ("The Distributor will be entitled to *resell the Products to its customers* at such prices as it may determine") (emphasis added); *id.* at Section 19.2.1 ("Upon termination of the Agreement for any reason: - the Company or its nominee will be entitled (but not obliged) to *repurchase from the Distributor* any stocks of the Products in the possession of the Distributor …") (emphasis added).  The fact that Diageo purported to retain title, or agreed to delayed payment terms, are insufficient to transform the transaction with Debtor into something other than a "sale" for purposes of trademark law.

Wells Fargo reserves the right to amend its Answer to add affirmative defenses and/or counterclaims as they become known and in accordance with this Court's orders.

Dated: September 14, 2020

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: _/s/ Jonathan R. Doolittle_

JONATHAN R. DOOLITTLE

Attorneys for Plaintiff Wells Fargo Bank, National Association

41

4827-5759-5083.v1